456 So.2d 1197 (1984)
Eytan GOLD, Yachoved Gold, His Wife, and Golden Bagel, Inc., Appellants,
v.
Alan L. PERRY and Eleanor S. Perry, His Wife, Appellees.
No. 84-80.
District Court of Appeal of Florida, Fourth District.
August 29, 1984.
Rehearing Denied October 30, 1984.
*1198 Charles L. Jaffee, Hollywood, for appellants.
John W. Case, Lauderdale by the Sea, for appellees.
GLICKSTEIN, Judge.
This is an appeal of a final judgment for the plaintiffs, Alan and Eleanor Perry, against the defendants, Eytan Gold, Yachoved Gold, and Golden Bagel, Inc. We reverse and remand for new trial.
Plaintiffs/appellees Alan and Eleanor Perry filed a four count complaint against the defendants, Eytan Gold, Yachoved Gold and Golden Bagel, Inc. The first three counts were based on non-payment of three notes executed by the defendants. The fourth count sought to foreclose on a chattel mortgage likewise executed by the defendants. The defendants answered and filed a counterclaim. The defendants claimed the plaintiffs had fraudulently induced them to execute the three notes and the chattel mortgage.
Thereafter, the plaintiffs added a fifth count alleging injury because of Gold's false statement of financial condition, conveyed as an inducement to the Perrys to sell him the business. Jury trial was held beginning December 5, 1983 on Counts I  III and V and on the Golds' counterclaim apart from the count seeking rescission. A directed verdict for the defendants was entered as to Count V at the close of the Perrys' case. The jury found for the plaintiffs, the Perrys, as to Counts I  III, and awarded them $50,750. The Perrys received final judgment on these counts and later were awarded costs and attorney's fees. On Count IV the court issued a supplemental final judgment based upon equitable estoppel in that the jury had found for the plaintiffs in Counts I  III, where the factual predicate was the same as for Count IV. This appeal followed.
The facts show that the defendants/appellants Gold contracted to purchase from plaintiffs/appellees Perry the Bagel Village Restaurant. The Perrys told the Golds the restaurant grossed $8,000 per week and the owners netted $2,000 per week (R.24). In the contract addendum at Item 12 is stated "Subject through [sic] visual observation buyers to remain on premises for a period of one to two weeks to substantiate sales of $8,000 per week." Paragraph 9 of the contract states "Parties acknowledge that this transaction is entered into by them in full reliance on their own independent investigations ... and it is agreed by both parties that no statements, representations or agreements made by either party ... shall be binding or constitute any obligation ... unless the same are reduced to writing and made a part of this agreement."
Eytan Gold and his brother-in-law did observe the business for seven days. They said they were not permitted to sit directly next to the cash register, but did observe from about eight feet away and daily checked the cash register tapes. An employee witness for the Perrys said the buyers never requested to sit next to the cash register. The tapes added up to the $8,000 gross that the owners had represented.
Thereafter the closing on the sale occurred, and as part of the purchase price the Golds signed three promissory notes and a chattel mortgage. The next day, the Golds grossed only $550 when they had been shown a gross of $1,821 the previous day. They thereupon decided not to make payments on the notes. After he became *1199 familiar with the workings of the cash register, Mr. Gold was able to determine that during his observation of the Perrys' business he had daily been given many more individual sale tapes to add up than there had in fact been transactions.
Evidence introduced at trial showed a monthly average gross for the Perrys' predecessor as owner, Vincent Sand, of less than $11,500. A certified public accountant said it was not possible that business increased as sharply for the Perrys as their amended sales tax returns indicated.
The Golds' nine month average monthly gross was $13,000, with an average of $19,500 per month during the high season. Two employees who had worked for the Perrys and continued with the Golds testified the restaurant was busier under the Golds than it had been under the Perrys.
In March of 1982 the Perrys had spent $1,129.75 for bagels; in March 1983 the Golds spent $1,917.55 for bagels. Bagels made up a big part of the business, because it was a bagel restaurant. The Perrys' ledger claimed a March 1982 gross of $36,054.50; the Golds' gross in March 1983 was only $19,847. Other similar supplies costs were compared.
Bank deposits of the Perrys in their restaurant account showed monthly deposits ranging (in round figures) from $8,000 to $17,000. Payroll account records showed deposits of under $1,000 per month. Original sales tax returns of the Perrys in late 1981 to January 1982 ran from under $7,000 to over $8,000 per month; amended sales tax returns, filed after the lawsuit was commenced, showed much higher revenues. The Perrys claimed that the original returns erroneously reflected only the sales of the last week of each month.
The Perrys showed amended sales tax returns and fronts of checks for tax payments for February and March 1982. The state, however, had no returns for those months, and the bank had not received those checks for collection.
The issue is whether the trial court erred in giving instructions to the jury, because of a conflict between them and the Florida Supreme Court's decision in Besett v. Basnett, 389 So.2d 995 (Fla. 1980). We conclude there was a conflict and that the giving of the instructions constituted harmful error. Defendants/appellants Gold objected to the following instructions to the jury:
Instruction No. 8. If the jury finds that representee made an independent investigation of the matter involved, he is charged with knowledge of all facts that he might have ascertained by making a reasonably thorough investigation.
Instruction No. 9. The jury may take into consideration the business experience and success of the parties in determining whether or not the parties justifiably relied upon representations and business dealings to their detriment.
Appellees argue that Besett concerns only real property transactions and that under Besett a contracting party may be liable for misrepresentation only when the other party has relied without making an independent investigation. Appellees maintain a different line of cases containing still viable law justifies the contested instructions. This line of cases includes Hirschman v. Hodges, O'Hara and Russell Co., 59 Fla. 517, 51 So. 550 (1910) and Potakar v. Hurtak, 82 So.2d 502 (Fla. 1955), among others. The law of these cases is that when a representee makes an independent investigation he is charged with knowledge of all facts he might have ascertained by making a reasonably thorough investigation.
The Supreme Court heard Besett because the Second District Court of Appeal's decision in Basnett v. Besett, 371 So.2d 705 (Fla.2d DCA 1979), was in conflict with the above mentioned Potakar v. Hurtak, 82 So.2d 502 (Fla. 1955). The Supreme Court upheld the decision of the district court, receding from Potakar. Potakar had held a person to whom false representations have been made is not entitled to relief because of them if by ordinary care and attention he could have ascertained the truth. 82 So.2d at 503. In Besett the *1200 Supreme Court adopted the principle of law expressed in Sections 540 and 541 of the Restatement (Second) of Torts (1976). The Supreme Court quoted the two sections in full as follows:
§ 540. Duty to Investigate
The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.
Comment:
a. The rule stated in this Section applies not only when an investigation would involve an expenditure of effort and money out of proportion to the magnitude of the transaction, but also when it could be made without any considerable trouble or expense. Thus it is no defense to one who has made a fraudulent statement about his financial position that his offer to submit his books to examination is rejected. On the other hand, if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in § 541.
b. The rule stated in this Section is applicable even though the fact that is fraudulently represented is required to be recorded and is in fact recorded. The recording acts are not intended as a protection for fraudulent liars. Their purpose is to afford a protection to persons who buy a recorded title against those who, having obtained a paper title, have failed to record it. The purpose of the statutes is fully accomplished without giving them a collateral effect that protects those who make fraudulent misrepresentations from liability.
§ 541. Representation Known to Be or Obviously False.
The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.
Comment:
a. Although the recipient of a fraudulent misrepresentation is not barred from recovery because he could have discovered its falsity if he had shown his distrust of the maker's honesty by investigating its truth, he is nonetheless required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses.
389 So.2d at 997. The Supreme Court went on to say:
A person guilty of fraud should not be permitted to use the law as his shield. Nor should the law encourage negligence. However, when the choice is between the two  fraud and negligence  negligence is less objectionable than fraud. Though one should not be inattentive to one's business affairs, the law should not permit an inattentive person to suffer loss at the hands of a misrepresenter.
Id. at 998.
The court stated that a recipient may rely on the truth of a representation, even if investigation would have revealed its falsity, unless the recipient knew the representation was false or the representation's falsity was obvious to him. Id.
It is true, as appellees maintain, that Besett involved no investigation by the representees at all, whereas the appellants here conducted an investigation of sorts. The Golds' investigation was, however, limited by the fact the Perrys claimed they had no regular business records for the *1201 Golds to examine, and that the Golds essentially had to rely on the register tapes provided by the Perrys. These tapes may have been contrived or amplified, according to some of the testimony.
Logically, extrapolating from Besett and applying particularly the paragraph last quoted above, a negligent investigation should no more leave the representee to suffer loss at the hands of a misrepresenter than one who investigates not at all. From society's standpoint, fraud is more offensive than negligence, and the defrauder should not be shielded by his victim's negligence.
Both from the fact that the sections from the Restatement quoted in Besett are not restricted to real estate transactions, and from later cases relying on Besett, it is clear that Besett is applicable to sale of a business. Kalb v. International Resorts, Inc., 396 So.2d 199 (Fla.2d DCA), pet. for rev. denied, 407 So.2d 1104 (Fla. 1981), concerns sale of a motel wherein the seller allegedly misrepresented gross income of the motel, and Foxfire Inn of Stuart, Florida, Inc. v. Neff, 433 So.2d 1304 (Fla.2d DCA 1983), concerns sale of all outstanding shares in an inn, where failure to disclose certain material facts, false entries in records, and false statements of fact about net worth, profit and satisfaction of employees with conditions of employment were alleged.
While we have found no post-Besett cases in which the representee made any investigation, we believe the following statement in Besett should be applied in fraudulent misrepresentation cases even where an investigation was made, so long as the falsity of the representation was not revealed thereby:
We hold that a recipient may rely on the truth of a representation, even though its falsity could have been ascertained had he made an investigation, unless he knows the representation to be false or its falsity is obvious to him. We recede from Potakar v. Hurtak insofar as it is inconsistent with our present holding, and we disapprove all other decisions inconsistent with our holding in this case.
389 So.2d at 998. If this is not done, one who does no investigating is favored over one who attempts to investigate. The rule of Besett being applicable in the present case, it was improper to instruct the jury that one who has made an investigation is charged with knowing whatever a reasonably thorough investigation would have revealed, and that a party's business experience and success may be considered in determining whether reliance was justifiable. Absent these instructions the jury might well have come to different verdicts.
DOWNEY and DELL, JJ., concur.